# THE WORLD SECRET SERVICE ASSOCIATION, INC., Appellant, v. THE TRAVELERS INDEMNITY COMPANY, Appellee.—396 S.W.(2d) 848.

Middle Section. August 27, 1965.

Certiorari Denied by Supreme Court December 6, 1965.

Cecil Sims, Nashville, for appellant.

S. McP. Glasgow, Jr., Nashville, for appellee.

HUMPHREYS, J.   This is a suit on a fidelity bond executed by Travelers guaranteeing the fidelity of the Association's secretary-treasurer, Maxwell Earl Allen, who, it was alleged, had embezzled funds in excess of the face amount of the bond, $5,000.00.

The execution of the fidelity bond was admitted by Travelers, which denied that complainant had suffered any loss for which it was liable under the bond and denied any substantive liability, and by way of further and

special defense, defendant denied liability upon the grounds:

(1) That the Association's loss, if any, was discovered by it in November or December of 1960, in spite of which no notice of the loss was given Travelers until May, 1961, and so notice of the loss was not given within ten days after discovery as required by the bond.

(2) That the Association did not file with Travelers the written, itemized proof of loss, duly sworn to, within two months after discovery of the loss, as required by the terms of the bond.

(3) That the loss, if any, under the bond was not discovered by complainant within twelve months from the date of commission of the act causing the loss, as required by the bond.

The Chancellor dismissed the bill by a written memorandum, in the course of which he said:

"This suit is on a fidelity bond, one provision of the bond being:

'2. That within 10 days after discovery, the Insured shall give the Underwriter notice of loss.'

From the ample evidence in this case, particularly the depositions of DeVries, Allen and Ackerman, it is quite evident that complainant discovered the shortage in December 1960. Much activity resulted from this discovery but the defendant was not given notice as required until May 1961.

I think the law is clear that the 10 day notice provision must be complied with before the underwriter can be held liable." Tr. p. 234.

The Association assigns the Chancellor's dismissal of the bill as error, contending that a fidelity bond must be construed as any other insurance policy is construed, and that unless it provides in terms for a forfeiture in event of the failure to give notice within ten days, such a provision will not be construed as a forfeiture as a matter of law; second, that there is no substantial proof in the record to justify the conclusion the Association discovered the misappropriation of funds in 1960.

At this point, we should also mention that Travelers has an assignment of error, growing out of the failure of the Chancellor to award it the twenty-five per cent statutory penalty provided for by T.C.A. sec. 56-1106, amounting to $1,250.00.

First, let us say that we agree with the Chancellor, that the evidence preponderates in favor of Travelers' contention that, although the Association became aware in November-December 1960 of the facts and circumstances with respect to the manner of the handling of its funds by its Secretary-Treasurer, Maxwell Earl Allen, upon which facts and circumstances it has sued, no notice of this was given to Travelers until May, 1961.

■ The word "discovery" used in a fidelity bond means the knowledge of facts and circumstances sufficient to satisfy persons of ordinary prudence that a loss has occurred. Nashville & American Trust Co. v. Aetna Casualty & Surety Co., 21 Tenn.App. 366, 110 S.W.(2d) 1041; King's Inc. v. Maryland Casualty Co., 169 Tenn. 404, 88 S.W.(2d) 456; Fourth & First Bank & Trust Co., etc. v. Standard Accident Ins. Co., 12 Tenn.App. 311.

Although it is true as here contended that DeVries and Ackerman testified, in substance, that they had no actual

knowledge of a defalcation until sometime after November-December, 1960, it is evident, as the Chancellor found, that they became aware during this November-December period of the salient facts and circumstances with respect to Allen's handling of the Association's funds, his writing of checks payable to himself in rather large amounts, and other matters, amounting to such "discovery", as required notice to be given as provided in the bond.

Not only does this appear from the revealing examination of these witnesses, who reflect a marked excellence in parrying questions until pinned down, it also appears from the stipulated testimony of John K. Neidow, a district adjuster for Travelers. In the course of this stipulated testimony, Neidow testified as follows:

"DeVries confirmed that the World Secret Service Association really became suspicious of Allen when Check No. 526 written November 15, 1960, by Allen and payable to the Statler Hilton at Detroit, Michigan, for $1,519.22 was returned because of insufficient funds about November 30, 1960. DeVries indicated this check was for convention date August 31, 1960, and he indicated too that a Mrs. Watts, who is a member of the Board of Directors of The World Secret Service Association, and who could be reached at Detroit, had just turned over, according to DeVries, $2,200 in convention fees to Allen prior to the writing of this check.

According to DeVries, the insufficient funds was called to the attention of Mr. Ackerman, president of the World Secret Service Association who maintains his office in Toledo, on or about November 30, 1960, or possibly no later than the first week of December, 1960. At that time, according to DeVries, an investigation

of Allen began by Ackerman going to Louisville and 'putting the pressure' on Allen so that Ackerman was allowed to pick up the accounts or what records Allen did have of his association funds and return them to Toledo. At that time, according to DeVries, December, 1960, Ackerman's auditors went over the books and according to DeVries again indicated in some form or another that 'things were not right.' DeVries stated that from January 1, 1961 to March 16, 1961, Ackerman's signature appeared on all World Secret Service checks drawn, pointed out Checks 537 through 545. This is in the form of a countersignature. According to DeVries, all records confiscated by Ackerman during his first visit to him in November or December of 1960 were returned to Allen during the latter part of December, 1960, although there is no correspondence on the subject according to DeVries between Ackerman and Allen but just personal conversations between the two parties at Louisville, Kentucky.

Mr. DeVries also pointed out to me that on November 15, 1960, the same date that Allen wrote the Statler Hilton check which 'bounced,' Allen also wrote Check 527 payable to himself in the amount of $250. DeVries said this check again had no supporting voucher, just that it was written to Allen and charged to 'personal.' According to DeVries, Ackerman, Hardgrave, and Samardick, all of whom are members of the Board of Directors of The World Secret Service Association, were to investigate Maxwell Allen at the request of the Chairman of the Board of The World Secret Service Association, namely a Harry Machelle who resided in Oakland, California. I could obtain no information from Mr. DeVries on the results of this investigation by The World Secret Service Board.

＊　＊　＊　＊　＊　＊

My next meeting with Mr. DeVries was at his office on October 19, 1961, in the company also of Joseph Ackerman, president of The World Secret Service Association. At that time, I was positively informed by Mr. Ackerman that The World Secret Service Association first became aware of the possible financial troubles because of the actions of former Secretary-Treasurer of The World Secret Service Association, Maxwell, sometimes in November, 1960. Ackerman told me he was called at that time by Mr. Bob Samardick (Robert P. Samardick, Sr., of Omaha, Nebraska) who phoned Ackerman from Omaha indicating to him that 'something was wrong in the office.' Ackerman told me this meant the office of the Secretary-Treasurer of The World Secret Service Association. Ackerman then indicated and confirmed that he went to Maxwell in Louisville on November 7, 1960, about these matters and also commented at the same instance that he was a very close friend of Allen having known him for approximately 20 years. In fact, he commented that Allen was one of his best friends. Ackerman gave me further background indicating, in fact, he had nominated Allen six times previously for the Secretary-Treasurer position. Ackerman indicated that he asked Allen point blank in Louisville on November 7, 1960, the financial condition of The World Secret Service Association. At that time Ackerman states he was told by Allen that there was a shortage now (November, 1960) of $1,800. Ackerman reports also that Allen indicated to him that the books were presently being audited by his accountant and would be available soon for any official of The World Secret Service Association to inspect in the near future.''

■ We think the conclusion is inescapable that during the November-December 1960 period the Association, through its officers, became aware of such facts and circumstances with respect to the handling of its funds (the same facts and circumstances, in the main, which it now contends prove a defalcation) as required it to give the ten-day notice provided in its undertaking.

The question then recurs, did the failure of the Association to give notice release Travelers from liability under its contract?

Travelers contends on authority of Nashville & American Trust Co. v. Aetna Casualty & Surety Co., 21 Tenn. App. 366, 110 S.W.(2d) 1041 and King's Inc. v. Maryland Casualty Co., 169 Tenn. 404, 88 S.W.(2d) 456, that such failure did release it, while the Association contends on authority of Prudential Insurance Co. of America v. Falls, 169 Tenn. 324, 87 S.W.(2d) 567, and Tibbs v. Equitable Life Assurance Society, 179 Tenn. 594, 168 S.W. (2d) 779 that noncompliance with the ten day notice provision did not.

The bond provides that, in consideration of an annual premium, Travelers will pay the Association not exceeding $5,000 for loss of money or property sustained through larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, wilful misapplication or other fraudulent or dishonest acts committed by Maxwell Earl Allen, Secretary-Treasurer, employee, in any position, alone or in collusion, while coverage is in force and discovered within 12 months after cancellation. The bond then goes on: "Provided, however, that within ten days after discovery, the insured shall give the underwriter notice of loss." These words, "Provided, however," are

recognized words of art for the creation of a condition precedent. With respect to this Williston says this:

> "Any words will create a condition which express, when properly interpreted, the idea that the performance of the promise is dependent on some other event. 'No particular form of words is necessary in order to create an express condition. Whether a promise is expressly conditional, and if so what is the nature of the condition, depend upon interpretation.' 'For the most part conditions have conditional words in their frontispiece and do begin therewith.' The early cases on conditions relate generally to estates in land, but the principles involved are the same as in covenants or promises. In the early books there are said to be three words most proper for the purpose: proviso, ita quod, and sub conditione; but there are also other appropriate words as—si, or si contingat. A great variety of words are now regarded as equally fit for the creation of a condition. Not only those mentioned above, but such words as 'when,' 'while,' 'after,' or 'as soon as', clearly indicate that the promise is not to be performed except upon a condition." Selections from Williston on Contracts, Revised Edition, sec. 671, pp. 546, 547.

Moreover, this language would appear to be equivalent to or possibly even more exacting than the provisions of the bond involved in King's Inc. v. Maryland Casualty Co. as follows:

> "The bond undertook to reimburse the employer (H. P. King Company) for losses 'which the employer shall have sustained by reason of any act or acts of fraud, dishonesty, forgery, embezzlement, wrongful abstraction or willful misappropriation on the part of any employee named in the schedule hereto attached.'

The bond further provided that 'notice of such loss be sent by telegram and by registered letter, both addressed to the company at its home office, Baltimore, Maryland, within ten (10) days after the discovery of such loss.' " 169 Tenn. 407, 88 S.W.(2d) 457.

The opinion then goes on to hold:

"We think the ten-day limitation for notice ran against the receiver just as it would have run against H. P. King Company, and that a failure on his part to give this notice within ten days of the discovery of Bane's abstractions released defendant Casualty Company from liability." 169 Tenn. 410, 88 S.W.(2d) 458.

In Nashville & American Trust Co. v. Aetna Casualty & Surety Co., supra, this Court followed the King's Inc. case, and certiorari was denied.

In Phoenix Cotton Oil Co. v. Royal Indemnity Co., 140 Tenn. 438, 205 S.W. 128, a demurrer, on the ground the bill showed that a condition in the policy for immediate notice had not been complied with, was overruled by the Chancellor. On appeal the Supreme Court, speaking through Mr. Chief Justice Neil, had the following to say:

"The complainant insists that, inasmuch as there was no technical forfeiture provided for in the policy, relief should not be denied it. The refusal to grant relief for failure to comply with a condition precedent does not depend on a right of forfeiture, although sometimes inaccurate expressions occur in opinions of the courts that seem to blend the two principles. See National Paper Box [Co.] v. [Aetna Life] Insurance Co., supra, 170 Mo.App. [361], 371, 156 S.W. 740,

quoting a passage from Cooley's Briefs on the Law of Insurance.

It is true that in the policy under examination in Blackman v. [United States] Casualty Co., supra [117 Tenn. 578, 103 S.W. 784], there was an express provision for forfeiture on failure to comply with the condition precedent, and this was commented on, and made a point in the decision; but it is not essential that there should be any provision for forfeiture in order to give effect to a condition precedent. This is apparent from the Massachusetts cases, and other cases cited, and from the very nature of a condition precedent. As said in Hatch v. United States Casualty Co., supra [197 Mass. 101, 83 N.E. 398, 14 L.R.A.,N.S., 503]:

"It is to be premised that the giving of this notice is not a condition subsequent, as it has been sometimes called. It is not simply a part of the rule of procedure for the enforcement of the liability of the defendant, as are the provisions of the fifth paragraph in this same policy providing for proofs of loss. The promise to insure is not absolute but conditional. The condition is that the notice, whatever it may be and by whomsoever or whenever given, shall be given. It is a condition precedent to the creation of liability or to the life of the promise; or, to put it perhaps in a better way, the giving of the notice is one of the essentials of the cause of action.'

It is true the notice in the case before us was given as soon as complainant received information from its manager at the place where the accident happened, but this was long after the occurrence, and the complainant must be held bound by the negligence of its manager.

Nor is complainant relieved of the legal effect of the failure to give notice by the allegations of the bill to the effect that the Royal Indemnity Company was not injured by the delay. At most, it is a matter about which opinions may differ, as to whether any injury was really caused by the delay under the facts stated; but the inquiry is irrelevant; for if the giving of notice was a condition precedent to the right of recovery, the failure to give it prevented any liability from attaching.'' 140 Tenn. 443-445, 205 S.W. 130.

Tibbs v. Equitable Life Assurance Society, supra, did not announce a new or different rule with respect to policies where notice within a given time is made a condition precedent to liability. The statement in that case is based on Johnson v. Scottish Union, etc., Ins. Co., 160 Tenn. 152, 22 S.W.(2d) 362, and Insurance Co. v. Whitaker & Dillard, 112 Tenn. 151, 79 S.W. 119, 64 L.R.A. 451. But these cases are not in regard to policies in which timely notice is made a condition precedent. These cases are with respect to policies which contain provisions providing for forfeiture under certain circumstances, but not providing for forfeiture with respect to notice and proof of loss. The exact proposition settled by Insurance Co. v. Whitaker & Dillard, and followed in Johnson v. Scottish Union is this:

''The rule laid down in Joyce on Insurance applicable to this state of facts is as follows:

'If a policy of insurance provides that notice and proof of loss are to be furnished within a certain time after loss has occurred, but does not impose a forfeiture for failure to furnish them within the time prescribed, and does impose forfeiture for a failure to comply with other provisions of the contract, the in-

sured may, it is held, maintain an action, though he does not furnish proofs within the time designated, provided he does furnish them at some time prior to commencing the action upon the policy. And this has been held to be true even though the policy provide that no action can be maintained until after a full compliance with all the requirements thereof.'

We regard this as a sound statement of the law, and adopt it.'' 112 Tenn. 167, 79 S.W. 122.

Finally, the fact that Chief Justice Green wrote the opinion for the Court in Johnson v. Scottish Union in December, 1929, and then wrote the opinion in King's Inc. v. Maryland Casualty Co. in December, 1935, would appear to be conclusive of the proposition that Johnson v. Scottish Union established no rule of law with respect to notice at variance with or contradictory of that applied in King's Inc. and, we find nothing in Prudential Ins. Co. of America v. Falls, supra, requiring a different result.

■■ In any event, as an intermediate appellate court we are bound by the opinion in King's Inc. since it has not been overruled, and cannot be distinguished from the present case, and so we overrule the assignment of error on this point.

■ Appellee's assignment of error on non-allowance of the statutory penalty is overruled. This matter addresses itself primarily and largely to the discretion and good judgment of the Chancellor, and, while we retain the right to correct his action in regard thereto, (and on occasion have the duty to do so) we do not have such a case here. Bearing in mind the apparent dispersion of actual authority to act in the interest of the Association,

and the extent to which this had been delegated to Maxwell Earl Allen, we cannot say the officers of the corporation acted in bad faith when, as is evident, acting on advice of counsel this suit was brought.

It results, the Chancellor's decree is affirmed.

Shriver and Puryear, JJ., concurring.